Robbins-Geller, on behalf of the Appellant. Your Honors, the District Court ruled that the defendant's omissions regarding the scope and the full causes of their labor shortage in their production facilities in Shanghai were made without cyanide. That ruling was error for three reasons. He didn't find that, I believe. He found that there was insufficient proof that they were made with cyanide, insufficient pleading of facts to infer that they were made with cyanide. Okay, Your Honor, I stand corrected. That error, that ruling was error because for three reasons. First, and while this Court is very clear that executive position alone is not enough, the first reason is the executive position of Defendants Liu and White combined with the centrality of the Shanghai production facilities to Diodes' massive quantity business plan made it crucial to the success of the business that those facilities be operating efficiently and keeping the gross profit margin up. Number two, an inference of cyanide can be drawn from the fact that Diodes, without permission or request from its customers, began shipping orders early during the class period in order to be able to recognize revenue early, which would then serve to disguise the actual diminution in the gross profit margin. And then last, the totally out of character and auspiciously timed stock sales of Mr. Liu during the class period also evidenced cyanide. Now the early shipping, though, if that occurred, would have exacerbated the labor shortage, wouldn't it? It would have been counterproductive to the scheme if there was one. Your Honor, it would kind of kick the problem down the road because what would happen would be that allowing them to ship from their, and Mr. Liu actually said this, they ship from finished goods inventory, so things that they had already made, they shipped from that and then they were able to recognize the revenue from that and then that would make their gross margin appear to be more stable than it would be otherwise if they were not doing that. So it's basically a kick the can down the road type of theory. It's very similar to what Judge Posner was talking about in the Telabs case where he said that sometimes people will do things in the hopes that the situation will right itself. Well, that's pretty much what happened here. And in addition to the fact that they, I'm sorry Judge Jones, did you? Go ahead. In addition to the fact that these sales helped mask that problem, they also were themselves very suspicious. The cooperating witnesses, particularly witness number seven, pointed out that at least one employee was instructed to say that we actually did have, or that they did have permission to do these early sales. Well, I have serious problems about your confidential informants here, whether there was adequate basis for the court to have used their statements. But aside from that, what I don't understand is the materiality of these misstatements because as I understand it, in February the company predicted that their margin would drop around, my notes may be poor here, but I had something about 36.5% and they figured it was going to drop by a point or a point and a half, and it did. And then in May, I believe it was, they predicted it was going to drop another point or point and a half, and it did. So if these additional labor problems that you're talking about were material, how come they wouldn't have resulted in a larger drop in margin than the company predicted? Well, it actually did for the second time around because what happened was that after the May statements, they had to issue an interim report in June to say that actually the drop in gross margin was going to be more substantial than we had predicted. But getting back to the materiality, Your Honor, I think that under Rubenstein, that when you have a stock drop, that's presumptive evidence of materiality. And in this case, we have that both after the May statements and then after this June corrective statement that we just addressed. The stock dropped 10% after the May statements, and then it dropped 14% after the June statements. Well, you know, the 10B-5 doesn't require the company to always be on an uptick, number one. It just says that the company has to describe its situation materially correctly. That's correct. But again, with Rubenstein, it says that once you choose to speak— But that's not enough for 9B. A stock drop alone does not prove that there's been a material omission under 10B-5 for 9B. Well, Your Honor, with respect to the pleading stage where we're at now, the TSC from the indicates that that's a jury question. We've got evidence that this Court has approved in Rubenstein. In addition, there's the Seventh Circuit case, Asher, that had a very similar situation where the defendants were saying, you know, look at our projections, and the Seventh Circuit held that that was a jury question, not a question— Well, and that always depends on the surrounding facts and circumstances. And in the Telabs case, it is also said that the Court has to take account of contrary plausible inferences. And the fact is, for instance, although the district court slightly misstated the timing of Mr. Liu's sales, they were 12.5 percent of his stock holdings. In terms of— You can say it's a lot, but it still leaves him on the hook and at risk for 87.5 percent at least of his investment in the company. Well, Your Honor, with respect to the stock sales, I have a couple of responses. Number one, in this Court's cases, this Court repeatedly expresses this test in a disjunctive form. It says if stock sales are suspiciously timed or at—or are suspiciously auspicious, that that is in and of itself is enough to draw an inference. And we have actually not the disjunctive situation here. We have both of them. And I think that's the central laborer's case that said that. Sales are out of line with prior trading practices or at times calculated to maximize personal profit. But you have to—you have to acknowledge—I mean, there is still, relatively speaking—yes, he sold shares, but he didn't—you know, you can argue about how many shares he sold and what significance it is. But your whole case turns on these confidential informants, does it not? Well, I wouldn't say that the whole case turns on it, because we have multiple theories of Sianner. But I think the confidential witnesses are important, and I think that the Court would be justified in relying on them here. And I've got a few points with respect to that. Well, let me just ask you, is there any evidence in the record? Because a lot of this appears to come off the shop floor in Shanghai. And I'm just sort of wondering to myself, are all these abused and poorly paid employees also bilingual in English? Who translated? What is there in the record that suggests that these—whatever these people were saying in Chinese on the shop floor has been accurately translated for purposes of pleading in the United States? Well, Your Honor, I'm sure that there was an investigator and an interpreter involved. I mean, I actually wasn't involved in the research of this particular complaint. But I think that at the pleading stage here under Tell Labs, we're entitled to a presumption that these allegations are correct. Well, no, you're not. You're only entitled to the presumption if there is adequate circumstances in terms of the person's, you know, identity, placement within the organization, job duties, et cetera. And it seemed to me that at least as regards the ones in-house in Dallas might be a different idea. And those are mostly relevant as to the early shipments. But with a—I was a production line supervisor in Shanghai. Well, what does that mean? Did he produce—what did he produce? The last few widgets on whatever the—on these diodes? Did he produce the packaging? Did he supervise one person or thousands of people? How do we have any—how can you extrapolate from one or two people who undoubtedly are Well, we're not talking about the entire labor situation in the country. No, you're talking about its biggest plant with 2,000 employees in Shanghai. That's correct, Your Honor. And the reason that I think that these informants are reliable under these circumstances is that they were people who were actually on the shop floor. So all the changes in policy that diodes undertook, they would have been affected by them. So they would have seen them. When their colleagues left to go to their different jobs, they would have seen that as well because they would see the machine over here is empty. That person is no longer here. And the district court actually found that with respect to these statements, that a lot of these witnesses were making statements that people in their position would in fact know. And that was at page 642 of the ROA, that the district court said facts that anyone working in the confidential witnesses' respective positions would likely know are the ones that we've pleaded. So the district court found with respect to a lot of these facts . . . Well, these are not facts. These are pleadings. And we review the case de novo. And so we're as capable . . . we are not bound by the district court on his interpretation of the reliability of the CIs. It is a de novo review, Your Honor. I just wanted to make clear that the district court found . . . I understand that. But I had a lot of questions. I understand, Your Honor. The district court found that there was a reliability question with respect to the witnesses' statements regarding what other jobs these other individuals had taken. That was what the district court actually objected to. But the rest of this stuff, the district court does not appear to have objected to. Now, I would also point out that these statements have cross-corroboration, right? This is the last case of the criminal case. I was a public defendant for a long time. And you know that warrants, you know, frequently have multiple informants who are bolstering each other's stories. Well, if this case were actually to go to trial, how would you prove that up? I mean, you would really have to prove that this was the cause of the employee problems, would you not? Well, no, because we have two claims here. We have the fact that they didn't reveal the scope of their shortage and that they didn't reveal the causes. Now, the scope is something that's totally independent from the reasons that people left. And they did not disclose that scope. When they were asked if there was any abnormal drivers to their shortage, they didn't say, well, actually, 300 people left in the beginning of February, as two of the confidential witnesses said. So there's the scope issue, and then there's a separate issue with respect to the reasons. So we wouldn't need to prove an actual causal effect with respect to the scope claims. Now, Your Honors, if I could briefly return to the issue with respect to inferring Sienner from the position and the centrality of Diode's packaging in Shanghai. As Your Honors already indicated, packaging is what went on there, and that's one of the most crucial things in Diode's business, because they basically tout that themselves as their competitive edge against other companies. And they don't subcontract that function out. They do it themselves. So it's particularly important for them and provides evidence that shows why, or allegations that show why Lew and White would be paying particular attention to what's going on in the Shanghai facilities. These items are mass-produced. The packaging involves getting the plastic around these items that are, I think, 5 millimeters. I think we said 3 hyphens in the brief. So it's extremely painstaking work, and individuals who do this work take a lot of training. It's 6 to 8 weeks just to be 60 or 70 percent of an experienced worker, and then 6 months to become proficient. So it's devastating to a company like Diode's to lose a significant number of workers, and we've alleged that they had 6 to 700 packaging workers that they had to replace during 2011, 1,000 workers total in the first half. But the misstatements you're talking about occurred in February, March, and May. Is that correct? No, ma'am. February, May, and June. Okay. Sorry. February, May, and June. And I'm not quite sure how you can extrapolate backward from the end of 2011, because at one point you assert that there was nearly 100 percent turnover on the shop floor by the end of 2011. Well, obviously, they couldn't have predicted that. No, I understand that, Your Honor. I think with respect to the February statements, the confidential witnesses, two of them, indicated that 300 people had left in the beginning of February. But that's when the Chinese New Year is, so if they all go home, you know, back to the farm for New Year, how do you know they're not going to come back? Well, what happened was, is that before the Chinese New Year, Diode's issued a policy  I understand that, but again, nobody has ever accused China of having the most employee-friendly labor policies in the world, and we're not in a position, it seems to me, the courts aren't in a position to just accept that suddenly there's tremendous labor unrest and people are not going to come back because the company says you're going to work harder before you leave or have one day less. You see what I'm saying? I understand that, Your Honor, and we have an allegation saying that 300 people left in the beginning, not left for Chinese New Year, but quit in the beginning of February of 2011. That would be before the first set of statements. And then once the May statements, you know, they continue to have problems. They continue to lose employees throughout that period of time. I think in Plotkin, this court pointed out that when there's a particularly significant disaster, it's fair to assume that the signs of that preceded when the disaster occurred, and that's with respect to the cancellation of the contracts in those cases. Here we have, like I said, 1,000 people in the first half of 2011 leaving, so it's fair to assume that before those May statements were made that they continue to have those problems. I just think that's culturally ignorant. I mean, if it were an automobile manufacturing plant up in, you know, Michigan or a Hughes Tool Company in Houston that either has a labor union or where we know what the background labor situation is, I mean, I just think—and even though, you know, there are people of the same nationality here, I think you're making a great leap when you infer that the that they might be here. Well, Your Honor, I understand your point. Is there any case from, you know, is there any cross-cultural case similar to this that you're aware of in the securities context? I can't cite a case to Your Honor. I would say, though, that these individuals, the witnesses, are the people on the shop floor, so they are best positioned to be culturally sensitive, as Your Honor's pointed out. And also, again, the scope of the labor shortage in this case is independent of the reasons why people left. So even if Your Honor is correct as to that, that would still leave the scope claim intact. If Your Honor has further questions, I'd like to reserve. Thank you, Your Honor. Mr. Steegey. Good morning, Your Honor. May it please the Court, John Steegey from Shepard Mullen for the defendants' appellees. And I will resist the temptation to make a Great Leap reference here, given that we have China. But what I would say is that what we really have here is a company that did make disclosures about labor problems in China. It disclosed, as Judge Jones referenced, the impact those labor problems would have on the company's business. It pre-announced, it took great pains to make those disclosures precisely to alert investors that there would be an impact. And in fact, the impact on the company was exactly as predicted. These 300 folks who left, well, if in fact they did leave to go to different factories that were being built because of the Chinese five-year plan in the countryside, then in fact it was disclosed. What we have here is not a situation of a false statement demonstrated to be false. We have what is alleged to be true statements. There's no dispute that China was established. Material omissions is what? Exactly. This is an omissions case at best. At best. And so the question then is, were there enough facts pled to put in the minds of Dr. Liu and Mr. White that these allegedly omitted company-specific facts were the cause of any disconnect between reality and what was represented to be reality? And in fact, there is no daylight as to the financial impact on the company. It was exactly as predicted. To the extent that is scope, I'm not sure what scope means here, but to the extent scope means financial impact, then there's no daylight. To the extent plaintiffs in their Rule 28J letter really identify, they talk about scope and duration. Today we heard scope and full causes, but in fact in their briefing they call it scope and duration. Okay. We do get to June and we get the company admitting, candidly, that it's taking longer than previously predicted to resolve these labor problems. And that's a forward-looking statement, or prediction that is alleged to be false. So to the extent duration is at issue, then yes, you have some daylight there. So then the question is, do plaintiffs plead any facts to say the delay, the one-quarter delay in resolving these labor problems was due to those company-specific causes as opposed to the causes that were disclosed? And by the way, again, our view is that those company-specific causes are embedded broadly in what was disclosed. So for example, the company has labor problems so they want to try to push the workers to work harder. That results apparently, allegedly, in some people leaving. How is that materially different from what was disclosed, particularly Chinese New Year, people not coming back? Embedded in there is they must have gotten, may have gotten jobs other places. And that factor, the Chinese government was pushing to have factories built inland, again, other places for these folks to go. But all that said, of course, Rule 9b and the PSLRA require the plaintiffs to plead these facts, give us some facts, say from those confidential witnesses on the shop floor who say these 300 people, presumably anecdotally, they wouldn't possibly know that there is exactly 300, were they going, where were they going, were they not coming back for New Year? How would they have known all of this? And that goes to the reliability of the confidential witnesses as pled. So in the absence of those dots being connected, that these company-specific reasons were the difference between what was disclosed or what was represented and what actually happened, you don't have those dots being connected on the fundamental issue which gets you from a material omission. But even more importantly than that, you come back to C-Enter, and that's really where the certainly what the lower court ruled and where I think we get to an affirmative here. Given that duration implies a forward-looking statement, that's an actual knowledge standard on the PSLRA, not just recklessness, but even with recklessness, do any confidential witnesses, do any documents cited in the complaint, does anything in the amended complaint put that information, specifically the information of the difference, in the minds of Lew and White? Nothing. Nothing is there. This is, I used the Lorman case, for example, one of the more recent cases, more recent from 2009, where there was a reversal. That, my goodness, you had company documents, you had specific witnesses that put in the minds of the speakers, contrary, directly contrary evidence as compared to what was disclosed. Here you just don't have that. Let me address the pull-ins for a second. Again, there's a CW disconnect here. We have four confidential witnesses who talk about these pull-ins, and we talk in our brief, there's nothing inherently wrong with a pull-in. Other courts have held that, if it's accounted for correctly and if they're real orders. There's no witness, no CW, who connects the dots of the pull-ins to an attempt to hide or somehow address these margin problems from the Chinese labor situation. In other words, the CW say this stuff happened, but that essentially the bridge to get from pull-ins happened to they were done intended to mislead or to undermine the forward-looking statement is derision. Not a single confidential witness does that. What you have there is, frankly, speculation by the plaintiff's lawyer that these pull-ins were done for a fraudulent purpose. It's just not there. These are the types of details that the Reform Act PSLA requires the plaintiffs to plead. Goodness knows this court's case law is exceedingly robust as to the standards for pleading. What was the 2009 case that you were referring to? Lorman v. U.S. Unwired. Lorman. Lorman, right. I'm referring to that one because I think that shows an example where this court has held that, in fact, sometimes plaintiffs can plead, but, boy, does that show how much detail really does need to be pled. I think it shows in sharp relief how little there is here. And, of course, the Indiana Electrical v. Shaw case, Judge Jones, Your Honor's decision there, lays out, of course, the law here, but also that's a great illustration, much more comparable to what we have here in terms of the absence of details of those connecting the dots. Give us numbers. Why were those 300 people supposedly the difference between solving the problem by the second quarter as represented versus it taking one more quarter? The only other thing I would really address in addition to other things, we have the stock sales. There's no doubt that there were stock sales here. There were a relatively small amount, 12.1 or so percent. They weren't small comparatively to what that individual was used to doing, was it not? I thought the allegations were an extraordinary amount, at least for him. So, and clearly plaintiffs focus real more on the timing than the amount, right? Absolutely. What I would point out here is that understanding how these cases often are brought, right? Now, this case was filed at the almost expiration of the statute of limitations. And what we know happens is that folks will look at stock sale records. Find some that are bunched up. Look for a stock drop shortly thereafter and then build a case around it. So, I don't think we should be too surprised that we see stock sales in any case because that's kind of how these get built. But there's no question. There's a timing issue on the stock sales. They are during the class period. They're bunched together. Stock price is high. No doubt about that. And what was pled, that's the reality. But, as we also know in this court and every circuit, stock sales alone aren't there, don't get you to the strong inference. And in the absence of a CW who puts any information in the minds of Lew and White, and these, again, the pull-ins is just a, the leap again to get it to intent isn't there. Have you come across any other cases that had confidential informants in other countries? None that I'm aware of, but more importantly, I've not seen a case where a court has focused on that distinction. I would say, though, that it's unquestionably here a function of the vagueness to which the CWs are described. And honestly, we know, and this is not in the record. I'll be very clear. They are folks in Shanghai who probably don't have English proficiency, but- That's my point, that's simply my point. They're asking us, they're asking the court to say nothing of ultimately jurors, to make leaps of cultural knowledge that I don't think we're equipped, I don't see how we're equipped to make. And certainly, Your Honor, that may be the case, I think, for our purposes and with respect to the process and where we are in the proceedings and what was alleged. I would simply say the key point is the lack of any reliable visibility that these folks would have as to these broader trends. To be able to identify those company-specific reasons as the cause. You don't have the local HR manager in Shanghai. Correct, Your Honor. Or the plant manager, or the deputy plant manager. Or his or her boss in Plano. Right. And that's where we have, I think, the major disconnect here. So with that, Your Honors, I would say, I don't think there's any question that the kind of special circumstances that this court in Dorsey, and in Plotkin, and in Matheson held would allow a presumption that, or more of an inference that folks in their positions would have known all of this. Hasn't Judge Posner had some sort of language that might suggest that even though the company accurately predicted its declining, these declines, that you could still have a basis for pleading a case? The law has long, but both Judge Posner and the law has long recognized, much to the chagrin of a lot of folks, that even accurately reported numbers in certain circumstances. It's not a get out of jail free card, by any stretch. Companies can't mislead. And what we're saying here, even with true numbers, what we're saying here though, is that this complaint doesn't have those additional details to get you from, these numbers are accurate, yet somehow we're hiding something. When the company did disclose, we are having labor problems in China. Major causes, the causes from our viewpoint are China's new five year plan and the Chinese New Year. Those causes are going to hit us by certain amounts, and they turned out to be true. The only, again, the only daylight is the duration. We're off a quarter, Dr. Liu was off a quarter in his prediction as to when this would get resolved. And unless the plaintiffs can say the reason for that being off a quarter was these 300 people choosing to go to competitors or not being happy with their bonus, the dots are not connected. Of course, the court below, as is required, considered contrary inferences. TELABS mandates that this court consider contrary inferences. And I think a company that affirmatively discloses its problems tells investors this is going to hit us. Those are facts that counteract an inference of standard. This court has held, and the Supreme Court as well, omissions and ambiguities on the plaintiffs. The absence of CWs, the head of HR, for example, in Plano. Or the absence of facts that connect this actually diminishes, counteracts the strength of the inference of standard. So we have that. The poll is, the judge below, I think also observed that there was something contradictory there. If you're a company having production problems, would you affirmatively try to run down your own inventory? Seems counterintuitive. Now, plaintiffs would say, yeah, but people do counterintuitive things. But you know what? We're under a pleading standard that requires the court to consider what is a more plausible, more reasonable, more cogent, compelling inference here. And for a company that actively discloses its problems with the Chinese labor market to then try to then act inconsistent with that by these pollers, it doesn't make sense. And again, in the absence of a CW who says the reason they did it was to try to run up revenue and make it look better, why would the company disclose any problems? It doesn't make sense. It doesn't add up. And in terms of weighing the relative inferences, we believe that here, the much more compelling inference, much more cogent and compelling, is of no scienter. Again, scienter being not just an intent to defraud, and not just a knowledge of undisclosed facts, but a failure to disclose two actively mislead investors. It's two things, not just knowledge of undisclosed facts. With that, the inferences, Your Honor, just aren't there to get you over the PSLRA hurdle. Well, I mean, you make a very cogent argument, opposing counsel, certainly able as well. But it seems to me these company-specific facts could tie in as an effort, as a reasonable inference for the duration of the problem. If you lose a large number of your employees, if the efficiency matters that are being claimed in the complaint are correct, it would take longer, where if it's just a Chinese New Year, normal source of problems in China, that sort of impact on the workplace might not have occurred. Isn't that a tie? Doesn't an inference potentially arise that the failure to disclose how this company was hit harder than others does explain why it took an extra quarter? A plausible inference, perhaps, under Rule 8, maybe, under Bell Atlantic and that line of cases. Reform Act, the PSLRA requires more, requires the plaintiffs to plead those facts to get you over that hurdle. It does not allow the court to just draw the reasonable inferences to the extent that is reasonable. Different pleading standard. With that, Your Honors, I will save a few minutes and earn a brownie point, I hope. Thank you very much. Okay. Mr. Hubachek. Thank you, Your Honor. First, when I say scope, I'm talking about the number of people that they were missing. The first statements they made in February, they said they had a labor shortage, but they never said how short. When asked if there are any abnormal drivers, they didn't say, yeah, we lost 300 people who quit in the beginning of February, as we've alleged. So when I say scope, that's what I'm talking about, and they're two separate claims. They never disclosed the number of people that they were missing, and they never disclosed their additional company-specific reasons that led to the people leaving. But they're mutually independent. So the fact that they didn't disclose the number of people who are gone, i.e., how short was the labor shortage, is in itself a claim, and they never disclosed that. Now, with respect to the disclosures that Mr. Stigy was touting, their first set of disclosures in February were not material disclosures about the company's problems. I mean, the stock actually went up 15 percent after their February disclosures. In May, when they admitted that they needed more time to train, then that's when they had their first stock drop. And then again in June, when they said that their effect on the gross margin metric would actually be much worse than they had previously said, then the stock fell again. Your brief talks about, however, the disclosures. You have to say the February disclosures are bad because otherwise you don't have a natural inference from Mr. Liu's sales. So you have February and you have May. But I didn't think your brief, at least there's not a subhead about June disclosures. But that is in the class period, and I'm trying to show that. The class period ran from February to June, right? Yes, ma'am. And it ended before the June disclosures, right? No, I think it ended on that day, and that was the last stock drop. So as the information filtered out in May and then in June, that's when the stock dropped. When they didn't tell any of the truth in February with respect to the scope of their actual problem, then their stock price actually went up. And, again, in May they said the reason that they're having trouble is they need more time to train. Nothing about the fact that they lost 1,000 people in the first half of the year. They needed 600 or 700 production workers. They lost 300 in the beginning of February. Those disclosures don't speak to the number of people that they lost throughout the period of time. I'd also like to just briefly touch on the early sales without permission. It's not just the fact that they sent out these orders early. They went out and looked for them. They had their own employees looking for orders to ship out early that involved these very basic commodity-like chips and sent those out. They caused their customers to get angry. One of them actually threatened litigation. One of their employees was instructed to lie to other employees about the fact that he did have permission. And, again, I mean they say they have 1,000 customers. I think it's 1,000, maybe more. Well, yes, but they were going to their biggest customers so they could ship their biggest orders so they could conceal the maximum amount of their gross profit margin loss. So that's the point from those sales, Your Honors. And then, finally, with respect to the Mr. Liu's sales, I forgot to point out initially that the Southland court found, that this court in Southland found, that a 16% amount of sales was suspicious, which is pretty much in the same ballpark as Mr. Liu's. So I believe that an inference of Sanger could be drawn from that as well. If Your Honors have no further questions, I'll submit. Do you know of any other case that involves confidential witnesses on the shop floor? I do not, Your Honor. I think I have some homework to do. Just wondered. Okay. Thank you, Your Honor. All right. The court will take a two-minute recess.